## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FLORENCE MEADOWS,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:07-cv-1010
(Barrett, J.; Hogan, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9), and the Commissioner's response in

opposition. (Doc. 11).

### PROCEDURAL BACKGROUND

Plaintiff, Florence Meadows, was born in 1952 and was 51 years old on her alleged onset

date of disability and 54 years old at the time of the ALJ's decision. Plaintiff attended school

through the eighth grade. Her past work history was as a bar maid for 23 years. Plaintiff filed

applications for DIB and SSI in March 2004, alleging disability since December 2003 due to a

left knee replacement, left ankle fracture, and broken ribs from an automobile accident.

Plaintiff's applications were denied initially and upon reconsideration. Plaintiff requested and

was granted a de novo hearing before an ALJ. On September 27, 2006, plaintiff, who was

represented by counsel, appeared and testified at a hearing before ALJ Melvin Padilla. A vocational expert also appeared and testified at the hearing.

On June 21, 2007, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from severe impairments of residuals of a healed left ankle fracture, residuals of a left total knee replacement, an adjustment disorder with depressed mood, and obesity (Tr. 23A), but that such impairments do not meet or equal the level of severity described in the Listing of Impairments. (Tr. 28). The ALJ determined that plaintiff's allegations concerning the intensity, duration, and limiting effects of her symptoms are not entirely credible. (Tr. 32). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform light work activities, subject to the following restrictions: no climbing of ladders or scaffolds, or working at unprotected heights; no more than occasional balancing, stooping, crouching or crawling; no kneeling; no more than frequent climbing of stairs; must be permitted to alternate positions as needed; and limited to low stress jobs that do not involve inherently dangerous or hazardous activities, and are not fast-paced. (Tr. 29). The ALJ determined that plaintiff could not perform her past relevant work, but could perform a significant number of other jobs in the national economy, including jobs as a light unskilled garment sorter, box inspector, and microfilm processor and jobs as a sedentary unskilled addresser, microfilm document preparer, and surveillance system monitor. (Tr. 34). Consequently, the ALJ concluded that plaintiff is not disabled under the Act, and therefore not entitled to DIB or SSI.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental

3

impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the

4

physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. at 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima

facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544

6

(6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*,

7

111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

Plaintiff's primary problems relate to her left knee and left ankle. She began noting

8

difficulty with her left knee as early as 2002 when an MRI showed high-grade Class II-IV chondromalacia within the patellofemoral joint, as well as in the medial compartment. (Tr. 232). There was also a tear in the medial meniscus and a likely chronic tear of the ACL (anterior cruciate ligament). (Tr. 233). Plaintiff was sent to physical therapy for eight visits with only some improvement in her overall condition. (Tr. 254-81). She went for another 16 visits with again only some improvement. (Tr. 282-330). Her orthopedist, Dr. John S. Urse, prescribed an unloader brace, but plaintiff continued to have a lot of aching and soreness. An x-ray with her brace on still showed some "bone rubbing on bone in the intercondylar region," which Dr. Urse felt explained some of her pain. He recommended Synvisc injections. Dr. Urse noted that a "new knee" was inevitable, but he hoped to buy plaintiff more time. (Tr. 229). Plaintiff reported excellent relief from the injection. (Tr. 228).

Plaintiff continued to work until she was involved in a head-on motor vehicle crash on December 5, 2003. She suffered from left rib fractures, chest contusions, laceration of the left hand, bilateral knee contusions, and a fracture of her left ankle (medial malleolus). (Tr. 135, 137-38, 146-47, 150). A cervical spine x-ray was incomplete, but showed satisfactory alignment from C1-C5. A CT scan showed no evidence of fracture or dislocation. (Tr. 140, 160). A left knee x-ray showed degenerative changes and mild joint effusion. (Tr. 154). A right knee x-ray documented soft tissue swelling but no fracture. (Tr. 155). Dr. Ronald Lakatos, M.D., performed an open reduction and internal fixation of the ankle fracture with screws inserted to maintain alignment. (Tr. 139). Plaintiff was discharged from the hospital to an extended-care facility. (Tr. 135). She spent another week undergoing physical and occupational therapy at this facility. (Tr. 168-71).

Dr. Lakatos saw plaintiff post-operatively for follow-up on her left ankle. (Tr. 175). On December 30, 2003, plaintiff reported she was "not really having any significant issues today." (Tr. 175). X-rays revealed that the screws in plaintiff's ankle were in proper position. (Tr. 175). Plaintiff was instructed to continue toe-touch weight bearing for 2-3 more weeks, followed by progressive weight-bearing; she was also instructed on range of motion exercises and to utilize a "walker boot." (Tr. 175).

On February 3, 2004, plaintiff was "overall doing well, ambulating using a walker boot, but only toe touch weight bearing to a limited degree." (Tr. 174). Dr. Lakatos recommended that plaintiff begin weight bearing as tolerated and work on range of motion exercises. Plaintiff asked about returning to her job and Dr. Lakatos thought she would be able to return to her work by the end of the month. (Tr. 174).

In a follow-up visit with Dr. Lakatos on March 16, 2004, plaintiff reported continued pain in her ankle, noting that she had swelling and achiness in the area even when she was up on her feet for a limited amount of time. Dr. Lakatos observed no obvious ligamentous instability, and plaintiff's range of motion was "matching the opposite side." (Tr. 172). However, Dr. Lakatos did note plaintiff had some pain with eversion and some mild tenderness in and around the medial malleolar region. (Tr. 172). X-rays showed a healed fracture. (Tr. 426). Plaintiff also noted that she had a fair amount of knee pain, and this was more of a problem than her ankle pain. Dr. Lakatos recommended she undergo a course of physical therapy to help with strengthening ankle musculature, that she take ibuprofen 800 mg. as needed, and that she follow up with her other orthopedist concerning her knee. (Tr. 172).

Plaintiff returned to Dr. Urse on March 17, 2004. She reported her left knee was sore,

10

and was worse with prolonged walking. Plaintiff reported she received "excellent relief with the cortisone shot a year ago and wants to know if she can get another." (Tr. 228). On examination, the left knee showed a boggy effusion. Range of motion was limited, showing loss of full extension and flexion. There was a slight atrophy of the quadriceps on the left. On palpation, there was pain primarily over the medial compartment of the left knee. Dr. Urse also noted crepitus during active and passive range of motion. The knee showed a 10° varus deformity with a slight varus prolapse instability on the left, "most likely due to medial compartment collapse." (Tr. 228). Dr. Urse went ahead with a cortisone injection, but discussed the option of a knee replacement. *Id.*

Meanwhile, plaintiff attended physical therapy for her ankle. (Tr. 333-38). The therapy was interrupted because plaintiff was scheduled for a total knee replacement. (Tr. 338).

Dr. Russell, plaintiff's family physician, responded to a questionnaire from the state agency in April, 2004 and submitted her treatment records. At that time she noted that plaintiff would be unable to perform sustained work because of her knee and foot pain. Dr. Russell indicated that this pain would interfere with standing and walking. (Tr. 181).

In April 2004, Dr. Lakatos noted that plaintiff had continued complaints of ankle pain, but he was unable to "really isolate any specific issue as to be the cause of her symptoms." (Tr. 422). When she was seen by Dr. Lakatos on April 27, 2004, he noted some slight improvement and felt she was moving with less symptoms. Dr. Lakatos suspected that plaintiff's lowgrade symptoms could be related to tendinitis or arthritis, but he noted that the fracture itself was well healed. (Tr. 423). Dr. Lakatos noted plaintiff should continue for another two weeks from work and that she could likely return to work after her knee replacement, although "perhaps with some

11

restrictions on limiting her standing time." (Tr. 422). Dr. Lakatos noted that if plaintiff continued to have problems, she should see Dr. Laughlin.

The total knee replacement (left total knee arthroplasty) was performed on May 6, 2004. (Tr. 195). Plaintiff was discharged in good condition to a nursing facility for further rehabilitation. (Tr. 339-74). Two days after discharge from the Greene Oaks Nursing Facility, plaintiff was readmitted to the hospital because she was septicemic due to an E. coli infection. (Tr. 208). Dr. Urse was concerned that this bacteremic episode made plaintiff' knee stiffer than it would have otherwise been. (Tr. 227). On June 2, 2004, plaintiff reported that her knee felt pretty good but ached at night. (Tr. 227). On June 9, 2004, plaintiff saw Dr. Urse and reported that her knee "feels a little better." (Tr. 228). Dr. Urse concluded that no surgical intervention was warranted and recommended plaintiff work on range of motion in physical therapy. (Tr. 228).

Dr. Urse saw plaintiff again on July 14, 2004. At that time, range of motion of the left knee was 3° to 100° with some diffuse swelling and the knee was only slightly warm. Dr. Urse recommended a course of continued range of motion exercises, again expressing concerning about possible arthrofibrosis given the history of the gram negative bacteriemia infection. Dr. Urse noted that plaintiff had lost her health care insurance and might need to be seen through the orthopedic clinic service. (Tr. 226).

A state agency physician reviewed the file on July 23, 2004. He opined that plaintiff would be able to perform the exertional requirements of light work. (Tr. 250). He noted that plaintiff should only occasionally balance, stoop, crouch, or crawl, and that she should never kneel. (Tr. 251). The physician noted that plaintiff's left foot surgery had healed properly,

and following knee replacement surgery, an x-ray showed a solid fusion. (Tr. 251). The state agency physician also indicated that he thought plaintiff's allegations were "credible and consistent." (Tr. 252A). This opinion was affirmed by a second agency physician on October 6, 2004. *Id.*

In September 2004, Dr. Russell completed another questionnaire for the state agency. (Tr. 177). Dr. Russell noted plaintiff's left knee replacement (Tr. 177) and that she was "doing well" with her medication therapy for problems including depression, cholesterol, and diabetes. (Tr. 178). Dr. Russell identified no limitations in plaintiff's ability to perform work activities. (Tr. 178).

On October 5, 2004, plaintiff returned to Dr. Lakatos for a follow-up visit on her ankle. She continued to have the same symptomatology and Dr. Lakatos recommended she be seen by Dr. Laughlin. (Tr. 421).

Dr. Laughlin and Nicolas Grisoni, M.D., examined plaintiff on October 20, 2004. Examination showed that there was still tenderness to palpation over the posterior tibial tendon at the insertion site and the heel cord was tight. She showed some flattening of her arch. X-rays showed that the ankle hardware was in place. Dr. Laughlin diagnosed a posterior tibial insufficiency. (Tr. 420). He recommended further physical therapy, anti-inflammatories, and an orthosis (brace). (Tr. 419).

Plaintiff again underwent physical therapy, attending 10 sessions over a five-week period. (Tr. 375-409). Plaintiff was not able to reach her strengthening goal in the left lower extremity due to her knee condition. Her knee was to be revaluated. (Tr. 375).

Plaintiff was seen in the Cassano Health Orthopedic Clinic by Matthew Heckler,

13

M.D. on December 8, 2004. (Tr. 412-13). She reported that she still had a painful left knee. On examination range of motion was reduced to 90 degrees of flexion. Motor strength was normal and there was no laxity. (Tr. 412). Dr. Heckler recommended further evaluation to rule out an infection. *Id.* A white blood cell scan showed uptake around the left knee prosthesis, although this was considered "likely normal." (Tr. 415). Plaintiff returned to the clinic on January 12, 2005. Because of the continued reduction in range of motion (from 5° - 90°), Dr. Heckler recommended further therapy, although he acknowledged that plaintiff might have an "element of arthrofibrosis." (Tr. 410).

Plaintiff attended physical therapy from February 1-17, 2005, attending three sessions and missing five. (Tr. 452-59). Plaintiff's therapy goals were not reached because she did not return. (Tr. 452).

Plaintiff saw Dr. Laughlin again for her ankle on February 21, 2005, having just obtained her ankle brace the week before. X-rays showed good fixation. Dr. Laughlin indicated that plaintiff should continue with the brace. He expected that she would be at maximum medical improvement within six weeks. Plaintiff was not sure whether she would be able to return to work at that point. Dr. Laughlin noted, "We should request a functional capacity evaluation and then if she is unable to return to work due to a permanent impairment rating, I think it would be appropriate for her to pursue vocational rehab as well if she is not planning on going back to her previous job." (Tr. 418).

In report completed March 16, 2005, Dr. Russell concluded that plaintiff's medical problems would make it impossible for her to work an eight-hour workday. She again noted that plaintiff's ankle surgery and need to wear a brace resulted in limited and painful walking. (Tr.

14

429). Dr. Russell did not think that plaintiff could lift more than 10 pounds occasionally of five pounds frequently. She noted plaintiff required an ankle brace and could only stand/walk for a total of four hours in an eight-hour workday and for only one-half to one hour at a time. Dr. Russell opined that plaintiff could sit for up to four hours a day, but for only one to two hours at a time. (Tr. 432). In a letter dated July 26, 2007[1], Dr. Russell clarified that she did not think that plaintiff could work for more than four hours a day, regardless of sitting, standing, or walking. (Tr. 496).

In a follow-up examination with Dr. Laughlin on April 27, 2005, plaintiff was tender over the head of the screw on the medial side and there was minimal swelling in the ankle. She continued to have tenderness along her posterior tibial tendon and also along the whole area of her medial malleolus. Dr. Laughlin recommended surgery to remove the hardware to help with the point tenderness of over the screw. However, he did not think this was going to improve her stamina or ability to stand on her leg any further. He recommended that plaintiff seek vocational rehabilitation. (Tr. 460).

Plaintiff began treatment with Laurie Bankston, M.D. in December, 2005. On examination, Dr. Bankston noted that plaintiff had a "sort of rocker bottom deformity of both feet consistent with what looks like Charcot joint. Plaintiff reported that she had some intermittent tingling sensation in her feet with some sharp shooting pain. (Tr. 471). In January 2006, Dr. Bankston again noted the Charcot deformity of the right foot with some heel spurring on both the right and left with some flattening of the arch. Dr. Bankston assessed bilateral foot pain and

---

[1]The letter Dr. Russell wrote is dated July 26, 2007, and is in response to an inquiry from plaintiff's attorneys dated June 29, 2006. (Tr. 496). It appears that Dr. Russell's opinion was actually rendered on July 26, 2006, given that the ALJ considered Dr. Russell's letter and that the decision is dated June 21, 2007.

ordered x-rays of the feet. (Tr. 470). The x-ray of the left foot showed degenerative changes in the distal interphalangeal joints of the second and fourth toes, and a moderate-sized plantar calcaneal spur. (Tr. 463). X-rays of the right foot showed a moderate sized plantar calcaneal spur. (Tr. 462).

In March, 2006, plaintiff was having some trouble with her breathing and Dr. Bankston wanted her to have a cardiac evaluation. Dr. Bankston noted, however, that plaintiff could not walk on a treadmill. (Tr. 468). That same month, plaintiff presented to the emergency room complaining of back pain; she denied any lower extremity swelling, edema, or rash. (Tr. 464). The physical examination was normal. Plaintiff was given medication and discharged. (Tr. 465).

On March 29, 2006, plaintiff reported right wrist and back pain. (Tr. 466). Dr. Bankston noted plaintiff's back pain improved since the ER visit and taking medication. (Tr. 466). She was assessed with arthritic pain and prescribed medication. (Tr. 466).

In April 2006, plaintiff was seen by Dr. Knable for right wrist pain. (Tr. 501). Plaintiff reported a mass on her wrist, painful for several years, but worse over the last few months. (Tr. 501). She denied numbness or tingling. (Tr. 501). Dr. Knable observed a mass on the wrist, but noted no signs of carpal instability or tendon disruption. (Tr. 501). Plaintiff elected to have the mass excised on May 1, 2006. (Tr. 501, 505). A May 18, 2006 EMG of the left upper arm was normal, but showed moderately severe left carpal tunnel syndrome. (Tr. 504). There was no evidence of left ulnar nerve abnormality, or left cervical radiculopathy. (Tr. 504).

Plaintiff saw Carol A. Strong, D.P.M., for further evaluation of the pain in her ankles and bottom of her feet. (Tr. 474-75). On examination, pedal pulses were 2+/4, although the pulses were somewhat lighter on the right. Dr. Strong noted that the medial arches were

collapsed on both feet with acute pronation noted with gait. Range of motion of the right ankle revealed crepitus, although there was no pain with the motion. There was reduced range of motion of the left ankle with dorsiflexion, along with crepitus. (Tr. 474). Dr. Strong also noted reduced range of motion of the left knee on flexion and extension. She also indicated that there was 1+ pitting edema at the medial aspects of both ankles. Dr. Strong assessed plantar fascitis, degenerative joint disease, and crepitus, and recommended plaintiff wear New Balance shoes and an ankle brace on the left ankle. She prescribed home stretching exercises and recommended plaintiff ice the bottom of her feet daily. (Tr. 475). Dr. Strong also recommended that plaintiff continue taking her prescribed medication as directed rather than only "every now and then when the pain is bad." (Tr. 475).

In July, 2006, plaintiff's treating physician, Dr. Bankston, noted some decreased sensation in the left foot and suspected diabetic peripheral neuropathy. She again noted that plaintiff "looks like she has Charcot foot and has some decreased sensation." (Tr. 486).

In August 2006, plaintiff was prescribed a course of physical therapy for her right wrist pain. (Tr. 541). However, plaintiff cancelled multiple appointments due to car problems and was finally discharged for non-compliance. (Tr. 536).

Plaintiff has also been diagnosed with obesity. At the hearing, plaintiff testified that she is five foot tall and weighed 228 pounds. (Tr. 558). Her treating physician, Dr. Russell, documented her weight at 229 pounds in April 2004. (Tr. 182). When she was admitted to the hospital for knee replacement surgery, she was diagnosed with obesity. (Tr. 193). Dr. Bankston, who began treating plaintiff in December 2005, described her as "an obese female." (Tr. 471). Plaintiff weighed 227 pounds on March 29, 2006. (Tr. 467).

17

## HEARING TESTIMONY

At the ALJ hearing, plaintiff testified that her feet were bad, making it hard for her to stand and walk a lot. (Tr. 560). She testified that the pain in her feet was a "6" on a scale of 0 to 10, with 10 being the worst pain imaginable, 95% of the time. (Tr. 572-73). Plaintiff testified that she has pain in her left ankle 99% of the time, and it is generally a "6" or "7. (Tr. 573-74). Her ankles swell at times also. (Tr. 574-75). Plaintiff testified that her left knee hurt 98-99% of the time. (Tr. 562, 575). The pain in her left knee is generally an "8," on a scale of 0-10. (Tr. 575). Walking and standing more than 15-20 minutes increases the pain. (Tr. 575-76). She was supposed to have a follow-up surgery on her left knee but she did not have insurance or money to pay for the surgery. (Tr. 543). Plaintiff also testified that she has pain in her right knee about 50% of the time, with pain at about a "4" on a scale of 0-10. (Tr. 562-63, 576).

Plaintiff also testified to problems with her hands. (Tr. 576). Despite the surgery, she continues to have a constant pain in her right hand, a pain she rated as a "7" on a scale of 0-10. The pain is increased with use. She thought that she could use her right hand for about 20 minutes before she would need to rest it for about one-half hour. (Tr. 577). She adjusts household activities, such as sweeping, to take the stress off her right hand. (Tr. 579). Plaintiff also testified that she still has some pain and weakness in her left hand, but she does not typically have problems using her left hand. (Tr. 578). She is left-handed. (Tr. 579).

Plaintiff testified that she could walk for about 15-20 minutes at most before she would need to sit down and take a break. Plaintiff did not think that she could stand more than 15-20 minutes at a time either. She thought that she could sit for about one hour. (Tr. 569). She noted that she was most comfortable when she sat with her leg elevated. (Tr. 569-70). She

18

elevated her leg because when her knee was bent it hurt more. (Tr. 573). Plaintiff estimated that she could lift about 10 pounds. (Tr. 570). She also testified she could button and zip her clothes, cook, wash dishes, vacuum, do laundry, shop for groceries, dust, and make her bed, but had difficulty performing these functions and would work for 15 minutes and then rest for one hour. (Tr. 579-80).

A vocational expert testified at the hearing. She was asked to consider a person of plaintiff's age, education, and work experience who was limited in the manner set forth in the ALJ's RFC assessment. The vocational expert testified that such a person could perform a number of light and sedentary jobs. (Tr. 582). The vocational expert also testified that if the person could only stand and walk for four hours a day, sit for four hours a day, and could not lift more than 10 pounds, as Dr. Russell opined in March 2005, the number of light jobs would be reduced to 4500, but the sedentary jobs would remain. (Tr. 583). If the person needed to elevate her leg greater than stool height, there would be no jobs. (Tr. 585-86). If the person needed to rest her hands after using them for 15 minutes, there would be no work. (Tr. 584-85).

## OPINION

Plaintiff assigns two errors in this case. First, plaintiff argues the ALJ erred by not considering evidence of plaintiff's foot impairment in determining plaintiff's severe impairments. Second, plaintiff asserts the ALJ erred in evaluating the opinions of Dr. Russell, plaintiff's treating physician, by only considering whether such opinions deserved "controlling" weight and by not considering the other regulatory factors in weighing the treating physician's opinions. For the reasons that follow, the Court finds the ALJ's decision is not supported by

19

substantial evidence and should be reversed and remanded for further proceedings.

Plaintiff contends the ALJ erred by not considering whether her bilateral foot impairment is a severe impairment. A severe impairment is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

Plaintiff's medical records show that in December 2005, Dr. Bankston reported that plaintiff displayed a "sort of rocker bottom deformity of both feet consistent with what looks like Charcot joint." (Tr. 471).[2] The following month, examination revealed "what looks to be a Charcot deformity of the right foot with some heel spurring on both the right and the left and some flattening of the arch." (Tr. 470). Dr. Bankston assessed bilateral foot pain and ordered x-rays of plaintiff's feet. *Id.* X-rays of the right foot showed a moderate sized plantar calcaneal

---

[2]"Charcot foot is a sudden softening of the bones in the foot that can occur in people who have significant nerve damage (neuropathy). The bones are weakened enough to fracture, and with continued walking the foot eventually changes shape. As the disorder progresses, the arch collapses and the foot takes on a convex shape, giving it a rocker-bottom appearance, making it very difficult to walk. Charcot foot is a very serious condition that can lead to severe deformity, disability and even amputation. Because of its seriousness, it is important that patients with diabetes—a disease often associated with neuropathy—take preventive measures and seek immediate care if signs or symptoms appear." (Found at http://www.footphysicians.com/footankleinfo/charcot-foot.htm)

spur. (Tr. 462). X-rays of the left foot showed degenerative changes in the distal interphalangeal joints of the second and fourth toes. There was also a moderate sized plantar calcaneal spur. (Tr. 463).

In May 2006, plaintiff was examined by Dr. Strong, a podiatrist, for further evaluation of ankle and foot pain. (Tr. 474-475). On examination, Dr. Strong noted that the medial arches were collapsed on both feet with acute pronation noted with gait. (Tr. 474). Dr. Strong noted +1 pitting edema on the medial aspect of both ankles, and acute pain on palpation along the medial arch area of both feet where the planar fascia inserts into the medial anterior plantar calcaneal tubercle. Dr. Strong noted that the pain extends upwards toward the medial aspect of the medial tarsal tunnel areas of both feet and ankles. (Tr. 475). Dr. Strong diagnosed plantar fasciitis,[3] left ankle and knee with degenerative joint disease with limited mobility and crepitus noted, and pronatory defect of both feet. *Id.* Dr. Strong prescribed home stretching exercises, full length arch supports, New Balance shoes, and an ankle brace for the left ankle, and recommended that plaintiff ice the bottom of her feet daily. (Tr. 475).

On follow-up examination with Dr. Bankston in July 2006, Dr. Bankston again noted Charcot foot and decreased sensation. She assessed foot pain and noted that plaintiff continues on diclofenac, was wearing orthotics and New Balance shoes for support, and "has peripheral neuropathy secondary to her diabetes, but this is all currently stable." (Tr. 486).

In discussing the severity of plaintiff's impairments, the ALJ never mentioned plaintiff's foot impairment or treatment for this problem with Dr. Bankston and Dr. Strong. (Tr. 23A-28).

---

[3]Plantar fasciitis is irritation and swelling of the thick tissue on the bottom of the foot. Risk factors include foot arch problems (both flat foot and high arches), obesity, running, sudden weight gain, and tight Achilles tendon. The most common complaint is pain in the bottom of the heel, usually worse in the morning and improving throughout the day. (Found at http://www.nih.gov/medline/plus/ency/article/007021.htm).

While the ALJ mentioned Dr. Bankston's initial examination of December 2005 (Tr. 26), he omitted any discussion of Dr. Bankston's subsequent examinations and findings of Charcot foot, heel spurring on both feet, and flattening of the arch. (Tr. 470). Nor did the ALJ cite to or discuss Dr. Strong's evaluation of plaintiff's foot impairment. The only evidence cited by the ALJ in his decision concerning plaintiff's foot impairment were the x-rays of January 2006 which showed degenerative changes and moderate sized plantar calcaneal spurs. (Tr. 26).

The Commissioner contends this failure was not in error because the evidence does not suggest that plaintiff's foot problem limited her more than already set forth in the ALJ's RFC. (Doc. 11 at 10-11). The Court disagrees. When asked by the ALJ, "Why do you think you are disabled?" plaintiff responded, "Well, sir, my feet are bad, it's hard for me to stand and walk a lot." (Tr. 560). She further testified that the pain in her feet was a "6" on a scale of 0 to 10, 95% of the time. (Tr. 572-73). The reports of Drs. Bankston and Strong support that plaintiff suffers from an underlying medical condition which is confirmed by x-ray evidence and physical examination. The fact that plaintiff was examined by Dr. Strong on only one occasion and was prescribed "conservative" treatment does not mean that plaintiff's foot impairment was not severe. The question is not whether plaintiff's foot impairment is in itself disabling, but whether this impairment is no more than a "slight abnormality which has such minimal effect" on plaintiff that it would not be expected to interfere with her ability to work. *Farris*, 773 F.2d at 90. Plaintiff's testimony, coupled with the reports of Dr. Bankston and Dr. Strong, indicates that plaintiff's foot impairment is more than a slight abnormality which would be expected to interfere with her ability to stand and/or walk. In the absence of any discussion of plaintiff's foot impairment in the ALJ's decision, the ALJ's conclusion that plaintiff would be able to perform a

22

range of light work is substantially undermined. Because plaintiff is considered to be an individual closely approaching advanced age with an unskilled work history and limited education, if she is found to be limited to sedentary work she would be found disabled on the grids. Grid Rule 201.10, Appendix 1 to Subpart P, Part 4. Therefore, it was imperative that the ALJ explore the impact of her foot impairment on her ability to perform the walking and standing requirements described by the ALJ's RFC. Instead, the ALJ relied on the opinions of state agency physicians who rendered their opinions in 2004 and who had no information concerning plaintiff's foot impairment. (Tr. 29, 249-252A). The ALJ's failure in this regard is reversible error.

The Commissioner disputes the ALJ's failure to find plaintiff's foot problem severe is reversible error because the ALJ found plaintiff had severe impairments[4] and proceeded through the sequential evaluation process to evaluate plaintiff's RFC. (Doc. 11 at 10). The Commissioner argues that under these circumstances, the failure to find an impairment severe is not reversible error, citing *Maziarz v. Secretary of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987). (Doc. 11 at 10).

In *Maziarz*, the ALJ determined that the claimant suffered from several severe cardiac impairments. The plaintiff argued the ALJ erred by not finding his cervical condition to be a severe impairment at step two of the sequential evaluation process. The *Maziarz* Court found it "unnecessary to decide" whether the ALJ erred in failing to find that the claimant's cervical condition constituted a severe impairment at step two because the ALJ continued with the

---

[4]Although the ALJ found plaintiff suffers from a severe mental impairment, namely an adjustment disorder with depressed mood (Tr. 23A), plaintiff does not challenging the findings related to her mental problems.

remaining steps of the sequential evaluation process and considered the plaintiff's cervical

condition in determining whether he retained a sufficient residual functional capacity to allow

him to perform substantial gainful activity. Therefore, the Court concluded that any alleged error

at step two was harmless. As long as the ALJ considers all of a claimant's impairments in the

remaining steps of the disability determination, the ALJ's failure to find additional severe

impairments at step two "[does] not constitute reversible error." *Maziarz,* 837 F.2d at 244. In

other words, if an ALJ errs by not including a particular impairment as an additional severe

impairment in step two of his analysis, the error is harmless as long as the ALJ found at least one

severe impairment, continued the sequential analysis, and ultimately addressed all of the

claimant's impairments in determining his residual functional capacity. *See Swartz v. Barnhart,*

188 Fed. Appx. 361, 368, 2006 WL 1972086, 6 (6th Cir. 2006) (citing *Maziarz*).

> *Maziarz* is distinguishable from the instant case because it is not clear that the ALJ

considered plaintiff's foot impairment at the other steps of the sequential evaluation process.

There is no evidence that the ALJ addressed or included any limitations from plaintiff's foot

impairment in determining plaintiff's RFC. The ALJ relied on the opinion of the state agency

physicians to conclude that plaintiff has the RFC for a range of light work. (Tr. 29). These

physicians rendered their opinions in July and October of 2004 (Tr. 249-252A), before the

December 2005 and 2006 reports of Dr. Bankston and Dr. Strong, and before the January 2006 x-

rays showing degenerative changes and moderate sized plantar calcaneal spurs. Because there is

no discussion of Dr. Bankston's and Dr. Strong's reports in the ALJ's decision, the Court cannot

infer from a silent record that the ALJ considered plaintiff's foot impairment in rendering his

RFC finding. The Court finds that the ALJ's failure to fully consider plaintiff's foot impairment

in determining plaintiff's RFC is not harmless error and requires this case to be reversed and remanded for further development and clarification of plaintiff's foot impairment on her ability to work. Plaintiff's first assignment of error should be sustained.

However, to the extent plaintiff contends the ALJ erred by not deferring to the RFC opinion of Dr. Russell, plaintiff's one-time treating family physician, plaintiff's assignment of error is not well-taken. Plaintiff argues the ALJ considered only whether Dr. Russell's opinion deserved "controlling weight" in contravention of Social Security regulations and Sixth Circuit law. (Doc. 9 at 17-18). Plaintiff further contends the ALJ failed to consider the regulatory factors in assessing the weight to afford Dr. Russell's opinion or to give "good reasons" for rejecting Dr. Russell's opinion in accordance with *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).

Contrary to plaintiff's contention, the ALJ did not consider only whether Dr. Russell's opinion was entitled to controlling weight. (Doc. 9 at 18). Rather, the ALJ determined that Dr. Russell's opinion as to plaintiff's "disability status cannot be given controlling, or even great, weight" because it was neither well-supported nor consistent with other substantial evidence in the record. (Tr. 30).[5]

In addition, the ALJ did consider the regulatory factors in assessing the weight to accord Dr. Russell's opinion, namely the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of her opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. As the

---

[5]To be afforded controlling weight, the opinion of a treating physician must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530; 20 C.F.R. § 404.1527(d)(2).

ALJ explained in his decision, Dr. Russell's reported limitations in April 2004 ("unable to perform sustained work secondary to knee and foot pain") (Tr. 181) are inconsistent with her report of no functional limitations in September 2004. (Tr. 178). (Tr. 30). In March 2005, Dr. Russell opined that plaintiff would be unable to do even sedentary work on a full time basis (Tr. 435) and in July 2007, she opined that plaintiff could not work longer than four hours during an eight-hour workday. (Tr. 496). However, as noted by the ALJ, Dr. Russell had a limited treatment relationship with plaintiff, and saw plaintiff "only four times in 2003 (for side effects of hypertension medication, bronchitis and urinary tract infection); four times in 2004 (for follow-up after the automobile accident, check-up and fill out paperwork, and test results); and once in 2005 (for lipomas in feet)" then "switched to Dr. Bankston as her family doctor in December 2005." (Tr. 30; *see* Tr. 182-189, 427, 436). Dr. Russell's treatment records do not support the extreme limitations cited in her March 2005 and July 2007 reports stating that plaintiff was unable to work full-time. In addition, as the ALJ also noted, Dr. Bankston did not opine that plaintiff was so limited, nor is there evidence that Dr. Bankston considered plaintiff to be unable to work on a full-time basis.[6] The ALJ also noted that Dr. Laughlin, plaintiff's treating orthopedist and specialist whose opinion is entitled to more weight than that of a family practitioner, felt plaintiff was capable of vocational rehabilitation, an opinion which contradicted Dr. Russell's opinion of an inability to perform even sedentary work. (Tr. 31). Finally, the ALJ noted that Dr. Russell's opinion was inconsistent with that of the state agency physicians. (Tr. 31).

---

[6]Plaintiff contends Dr. Bankston was never asked for her opinion. However, as the ALJ noted in his decision, it appears that plaintiff's attorney asked Dr. Russell to give an opinion on plaintiff's ability to work in June 2006. Plaintiff proffers no explanation why she did not request RFC information from Dr. Bankston, to whom plaintiff was referred after Dr. Russell.

The ALJ considered both Dr. Russell's limited treatment history with plaintiff and the type of treatment provided. He also considered the medical specialties of plaintiff's treating physicians in weighing their opinions as well as the consistency of Dr. Russell's opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. Thus, the ALJ did weigh Dr. Russell's opinion in accordance with the regulatory factors and law of the Sixth Circuit. Since Dr. Russell's assessment that plaintiff was limited to less than sedentary work activity was not fully corroborated by her own treatment notes or the objective and other substantial medical evidence of record, the ALJ was not bound to give the treating physician's opinion controlling or even great weight. *Walters*, 127 F.3d at 530. Thus, the ALJ's decision in this respect is substantially supported by the record. Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 10/22/08

Timothy S. Hogan
United States Magistrate Judge

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FLORENCE MEADOWS,
    Plaintiff

    vs                          Case No. 1:07-cv-1010
                                     (Barrett, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **TEN DAYS** after being served with this Report and Recommendation ("R&R"). Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this R&R is being served by mail. That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **TEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).